19 Ariz. App. 594 (1973)
509 P.2d 725
STATE FARM AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Appellant,
v.
CIVIL SERVICE EMPLOYEES INSURANCE COMPANY, a California corporation, and Sidney V. Collins, Appellees.
No. 1 CA-CIV 1701.
Court of Appeals of Arizona, Division 1, Department B.
May 8, 1973.
Rehearing Denied June 28, 1973.
Review Denied July 17, 1973.
*596 Lewis & Roca by John P. Frank, D.W. Grainger and James P. Walsh, Phoenix, for appellant.
Mariscal, Weeks & Lehman by Phillip Weeks, Phoenix, for appellee Collins.
Johnson, Tucker & Jessen, P.A. by Kenneth L. Tucker, Phoenix, for appellee Civil Service Employees Ins. Co.
HAIRE, Judge.
Several issues are presented on this appeal by State Farm Automobile Insurance Co. (State Farm), including the very basic questions of whether there was any liability coverage afforded to the negligent driver by State Farm's policy, and if coverage was afforded, whether State Farm should be held liable over and beyond its policy limits. The trial court found not only coverage, but also that by reason of its bad faith refusal to enter into a settlement agreement with the injured plaintiff, State Farm should be liable in excess of its policy limits to the extent remaining unpaid upon *597 a confessed judgment entered against the negligent driver.
The following facts are stated in a light most favorable to sustaining the judgment entered by the trial court. On November 10, 1965, State Farm's policy was issued to Myron Johnson and his daughter, Jeanette Johnson. Myron was the first named insured, and the policy covered a 1960 Pontiac automobile owned and primarily driven by Jeanette. At the time the policy was issued, Jeanette was unmarried. On November 4, 1966, she married Robert Allmon. About one month prior to the marriage, the 1960 Pontiac became inoperative due to a defective transmission and remained in that condition until some time after the occurrence of the accident which gave rise to this litigation.
In late 1966 or early 1967 Jeanette and her husband purchased a Rambler automobile. This vehicle was purchased after the breakdown of the Pontiac, but prior to the time of the accident which resulted in this litigation. On March 4, 1967, Jeanette's husband was involved in an accident while driving to work in a Ford Mustang. This Mustang was owned by John Allmon, the husband's father. Subsequent to the breakdown of the Pontiac, the Mustang had been used by Jeanette and her husband, and Jeanette customarily drove it to and from her work. As a result of the accident, Sidney V. Collins received injuries which resulted in the filing of a lawsuit on May 29, 1967 against Jeanette's husband and his parents as defendants.
Civil Service Employees Insurance Company (Civil Service) carried the liability insurance on the Mustang, and furnished counsel to represent the defendants in the Collins lawsuit. On April 14, 1967, prior to the filing of the lawsuit by Collins, Civil Service had made a demand on State Farm that it take over the defense, allegedly as the primary insurer. State Farm rejected this demand, the lawsuit was filed on May 29, 1967, and on June 23, 1967 Robert Allmon brought State Farm into the litigation as a third party defendant. The third party complaint against State Farm alleged that State Farm "issued for consideration an automobile liability insurance contract which by its terms and pursuant to statute indemnified Robert Dee Allmon in this matter" and demanded judgment against State Farm for any sums which Collins might recover against Allmon and the costs of Allmon's defense. While the third party complaint did not set forth the precise theory pursuant to which coverage of Allmon while driving the Mustang was claimed, this theory became apparent when defendant Robert Allmon through his counsel filed a motion for summary judgment on October 3, 1967. The theory advanced was that under "Insuring Agreement II" of the policy relating to non-owned automobiles, Jeanette Johnson would have been insured while driving the Mustang, and that Robert Allmon, as her spouse residing in the same household, would also be covered. However, as later found by the trial court, the fallacy in Robert Allmon's theory was that "Insuring Agreement II" of the policy extended coverage only to "the first person named in the declarations" and thus extended coverage only to Jeanette's father and his household, and not to Jeanette and her husband Robert, who lived in a different household. Therefore, there was no coverage for Robert Allmon under this provision. In view of later developments, it is important to note that the initial claim of coverage for Robert Allmon was made under the above-mentioned Insuring Agreement II.
In the memorandum in support of Allmon's motion for summary judgment against State Farm, the following statement was made:
"When they were married, Robert and Jeanette owned a 1960 Pontiac. At the time of this collision, the Pontiac was in disrepair and a Rambler had been purchased to replace it." (Emphasis added).
A similar allegation was also contained in a later portion of the memorandum. These allegations, along with other representations, assume critical importance in the *598 total factual picture, since the eventual finding of State Farm liability was based upon the trial court's determination that notwithstanding these initial representations by Allmon, the Rambler was not intended to "replace" the Pontiac. The trial court's eventual findings in this regard were as follows:
"That the reason Jeanette Johnson Allmon and Robert Allmon purchased the Rambler was due to the fact they needed two cars, and the Rambler was not purchased as a replacement or substitute for the Pontiac. That said Rambler was never substituted for the Pontiac under the State Farm policy.
* * * * * *
"That after the purchase of the Rambler vehicle Jeanette Johnson Allmon and Robert Allmon continued to use the Ford Mustang as the temporary substitute vehicle for the inoperative Pontiac."
This finding that the Mustang was a "temporary substitute vehicle for the inoperative Pontiac" furnished a factual basis for the conclusion that Allmon was covered while driving the Mustang at the time of the collision.[1]
After the trial court's denial of Allmon's motion for summary judgment on the third party complaint, the Arizona Supreme Court rendered its decision in Universal Underwriters Insurance Co. v. Dairyland Mutual Insurance Co., 102 Ariz. 518, 433 P.2d 966 (1967), which held that the automobile owner's insurer had primary liability. This meant that in any event Civil Service (as the insurer of the owner of the Mustang) had the duty to defend and primary liability for Collins' damages. Under these circumstances, Allmon's counsel concluded that there was no point in pursuing the third party complaint further, and on January 17, 1968, by stipulation of the parties the third party complaint against State Farm was dismissed without prejudice.
On May 17, 1968, Collins filed an amended complaint in the initial action which for the first time named Jeanette Allmon as a defendant. At that time Collins' counsel also wrote State Farm contending that Jeanette was covered and that since her husband was on his way to work at the time of the accident he was also covered. Nothing in this letter set forth any additional ground for a claim against State Farm beyond any which had been offered in the already dismissed motion for summary judgment. This letter advised that Civil Service was prepared to offer $10,000 and offered to settle in full if State Farm would give an additional $9,990. State Farm responded that any liability was on the driver (Robert Allmon) who had no coverage under the State Farm policy.
This settlement proposal letter from Collins' counsel was followed by a letter from Allmon's counsel (employed by Civil Service) on August 22, 1968, which again constituted a demand that State Farm appear and defend, and put State Farm on notice that the Allmons would claim against State Farm for any excess. No immediate response was received from State Farm concerning the August 22, 1968 letter, and on August 28, 1968, six days later, the Allmons signed a confession of judgment in favor of Collins in the amount of $52,300. Under the arrangement which resulted in the confession of judgment, Civil Service agreed to pay its policy limits, $10,000, Collins would take judgment for $52,300 and agree not to execute against the Allmons for the unpaid balance, $42,300. In turn, the Allmons would assign to Collins any claim which they might have under the State Farm policy.
After the foregoing arrangement was consummated, Collins (as assignee of the Allmons) filed an action against State Farm alleging that State Farm had wrongfully refused to defend the Almons in the *599 first suit and had refused to settle within policy limits. The action was filed on April 23, 1969. In this action, State Farm filed a third party complaint against Civil Service, in essence alleging that counsel for plaintiff Collins and counsel for Civil Service engineered the above-described settlement and assignment of claim against State Farm for the express purpose of defrauding State Farm and in an attempt to avoid Civil Service's obligation to defend the Allmons under Civil Service's policy.
On February 10, 1970, the deposition of Robert Allmon was taken. State Farm contends that at the taking of this deposition, for the first time a contention was made that the Rambler had not replaced the Pontiac, but rather that the Mustang was a "temporary substitute automobile" for the Pontiac, thus giving rise to possible coverage under the substitute vehicle provision (Insuring Agreement I) of State Farm's policy covering the Pontiac. Although Collins still advanced the Allmon's original claim that coverage was afforded under Insuring Agreement II of the State Farm policy, this claim was rejected by the trial court, and the liability ultimately assessed against State Farm was based upon the theory of coverage under Insuring Agreement I, which theory was first advanced sometime subsequent to the settlement and entry of judgment in the personal injury action against the Allmons.
We have reviewed the transcript of the record in the action against State Farm and find evidence to support the trial judge's finding that the Rambler was not purchased as a replacement or substitute for the Pontiac, but rather as a second car, and that it was the Mustang which was used as a temporary substitute vehicle for the inoperative Pontiac. This finding supports the trial court's legal conclusion that Robert Allmon was an insured under State Farm's Pontiac policy when he was involved in the collision with Collins. However, State Farm contends that Robert and Jeanette Allmon were estopped by their prior words and conduct from claiming that the 1965 Mustang was a "temporary substitute vehicle" under Insuring Agreement I of the State Farm policy, and that therefore Collins, as an assignee, would likewise be estopped.
JUDICIAL ESTOPPEL
The primary estoppel argument advanced by State Farm is based upon judicial estoppel. It is well established in Arizona law that where a party has obtained judicial relief against an adversary by asserting or offering proof to support one position, he cannot later in another action between the same parties[2] take a contrary position on the same issue. In Re Estate of Cohen, 105 Ariz. 337, 464 P.2d 620 (1970); Adams v. Bear, 87 Ariz. 288, 350 P.2d 751 (1960); Martin v. Wood, 71 Ariz. 457, 229 P.2d 710 (1951); Fox v. Weissbach, 76 Ariz. 91, 259 P.2d 258 (1953); and Otis Elevator Co. v. Valley National Bank, 8 Ariz. App. 497, 447 P.2d 879 (1968). Appellant bases its judicial estoppel contention upon the allegations made by the Allmons in their motion for summary judgment against State Farm filed in the initial Collins' lawsuit. This allegation, as previously stated, was to the effect that the Rambler owned by the Allmons had been purchased to replace the insured Pontiac.
In discussing State Farm's judicial estoppel contention, we will assume, without deciding, that the allegations in the motion for summary judgment by the Allmon's counsel were binding against the Allmons for judicial estoppel purposes as though made personally by the Allmons.[3] We will *600 further assume that if the doctrine of judicial estoppel is applicable against the Allmons, it would also be applicable against Collins, their assignee, so that in effect the same parties were involved in both actions. Even with these assumptions, it is our opinion that the factual predicate for the application of judicial estoppel was not established.
The allegation that the Rambler had been purchased to replace the Pontiac was indeed inconsistent with the position taken by Collins (The Allmon's assignee) in the later litigation, in which State Farm's liability was based upon the contention that the Pontiac had not been replaced at all, but rather, was being held pending repair and the Mustang was being used as a temporary substitute automobile for it. However, the essence of the doctrine of judicial estoppel is not merely that a party has taken inconsistent positions in judicial proceedings. If such were the case, our rules would not expressly allow a party to state in his pleadings "as many separate claims or defenses as he has regardless of consistency", Rule 8 (f) (2), Rules of Civil Procedure, 16 A.R.S., nor would a party who has given sworn testimony in a deposition be allowed to later take a contrary position in testifying at the trial.[4] The essence of judicial estoppel is that a party has gained an advantage  obtained judicial relief  in one action by asserting one position, and that in view of his having gained that advantage, he must accept the burdens of that position in any subsequent litigation between the same parties involving the same issue. Under such circumstances the law will not allow a party "to have his cake and eat it too".
Applying the foregoing principles to the fact situation under consideration, we note that the Allmons did not obtain any relief in the prior action as a result of their counsel's statement in the motion for summary judgment that the Rambler had replaced the Pontiac. First, their motion for summary judgment was actually denied. Second, we note that the allegation was merely incidental and had no direct bearing or relevance to the grounds for relief rerelied upon in their motion. Third, there was never any substantive disposition made of the issues raised in the third party complaint in the initial litigation  upon stipulation of the parties the third party complaint was dismissed without prejudice when the Arizona Supreme Court filed its opinion in Universal Underwriters Insurance Co. v. Dairyland Mutual Insurance Co., supra, thereby establishing that in any event Civil Service would have the primary insurer's obligations. To the extent that it can be said that any relief was obtained in the first action insofar as the third party complaint is concerned, such relief was obtained by State Farm, not by the Allmons. Accordingly, we hold that the defense of judicial estoppel was not available to bar the questioned testimony in the second action or to preclude a finding of coverage for Robert Allmon under the State Farm policy.
ESTOPPEL AS APPLIED TO POLICY LIMITS
Insofar as coverage to policy limits is concerned, we hold that regular equitable estoppel is not applicable. As stated in Decker v. Hendricks, 97 Ariz. 36, 396 P.2d 609 (1964), the three elements of equitable estoppel are as follows:
"(1) affirmative acts inconsistent with a claim afterwards relied upon, (2) action by a party relying on such conduct and (3) injury to the party resulting from a *601 repudiation of such conduct." 97 Ariz. at 40, 396 P.2d at 611.
In considering the question of State Farm's liability to the extent of its policy limits, it is readily apparent that State Farm can show no injury from its alleged reliance upon its insureds' prior assertions  State Farm's liability to the extent of its policy limits exists because of its prior contractual policy undertaking insuring the Johnsons, and not from any reliance upon the assertions made by its insureds concerning the Rambler automobile.
Based upon the factually supported findings of the trial court and the lack of any valid defense, we affirm the trial judge's finding of State Farm liability to the extent of its policy limits. We turn now to the question of whether State Farm may be held liable in excess of its policy limits.
STATE FARM'S LIABILITY BEYOND POLICY LIMITS
A determination of the possible liability of State Farm for the judgment against its insured in excess of its policy limits requires a consideration of the extent of State Farm's contractual undertaking. One of the implied obligations under a contract of insurance requires the insurer to settle within policy limits in an appropriate case, although such an obligation might not be specifically expressed under the terms of the policy. Comunale v. Traders & General Insurance Co., 50 Cal.2d 654, 328 P.2d 198 (1958). The extent of this implied contractual duty has presented a troublesome area to the courts. However, prior Arizona decisions provide some guidelines. In Farmers Insurance Exchange v. Henderson, 82 Ariz. 335, 313 P.2d 404 (1957), the problem was first considered by the Arizona Supreme Court. The court adopted what has generally been referred to as the "equality of consideration" test, stating:
"It occurs to us that when the insurer is defending litigation against the insured, employs attorneys to represent the interests of both and has sole power and opportunity to make a settlement which would result in the protection of the insured against excess liability, common honesty demands that it not be moved by partiality to itself nor be required to give the interests of the insured preferential consideration. A violator of this rule of equality of consideration cannot be said to have acted in good faith." 82 Ariz. at 338-339, 313 P.2d at 406.
Later, in General Accident Fire & Life Assurance Corp. v. Little, 103 Ariz. 435, 443 P.2d 690 (1968), the equality of consideration test was again approved by the Arizona Supreme Court as the correct test to determine an insurer's possible liability in excess of policy limits for breach of its obligation to settle, as follows:
"... we do not find it difficult to sustain the jury's finding that General did not exercise its duty of good faith. It did not give equal consideration to its own and the insured's comparative hazards." 103 Ariz. at 435, 443 P.2d at 698.
See also Travelers Indemnity Co. v. Hudson, 15 Ariz. App. 371, 488 P.2d 1008 (1971); Chenoweth v. Financial Indemnity Co., 13 Ariz. App. 313, 476 P.2d 519 (1970). While in discussing and applying the "equality of consideration" test, the courts generally speak in terms of the "good faith" or "bad faith" of the insurer, it is readily apparent from the decisions that no dishonest or fraudulent motive on the part of the insurer is required in order to find that the insurer has failed to give the required equality of consideration to the interests of the insured. General Accident Fire & Life Assurance Corp. v. Little, supra. As stated in Crisci v. Security Insurance Co. of New Haven, Connecticut, 66 Cal.2d 425, 58 Cal. Rptr. 13, 426 P.2d 173 (1967):
"Several cases, in considering the liability of the insurer, contain language to the effect that bad faith is the equivalent of dishonesty, fraud, and concealment. [Citations omitted]. Obviously a showing that the insurer has been guilty of actual dishonesty, fraud, or concealment is relevant to the determination whether *602 it has given consideration to the insured's interest in considering a settlement offer within the policy limits. The language used in the cases, however, should not be understood as meaning that in the absence of evidence establishing actual dishonesty, fraud, or concealment no recovery may be had for a judgment in excess of the policy limits. Comunale v. Traders & General Ins. Co., supra, 50 Cal.2d 654, 658-659, 328 P.2d 198, makes it clear that liability based or an implied covenant exists whenever the insurer refuses to settle in an appropriate case and that liability may exist when the insurer unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement. Liability is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing." 58 Cal. Rptr. at 16-17, 426 P.2d at 177.
Therefore, in the present case the trial court's finding of fact:
"That defendant, State Farm, entertained an honest though erroneous belief that under the facts and law coverage did not extend to Third Party Defendants Allmon."
does not necessarily prevent a finding that the insurer was guilty of "bad faith" (i.e., breach of its duty) in failing to adequately consider the interests of its insured.
As indicated above, the claim against State Farm for liability in excess of policy limits is based upon the failure of State Farm to accept the Collins settlement offer which was within policy limits. In the normal case where the insurer admits coverage and is actively engaged in the litigation it makes sense to consider whether the insurer gave equal consideration to the interests of the insured or was guilty of "bad faith" in rejecting a settlement offer. However, is the same test equally applicable when the insurer, entertaining "an honest though erroneous belief" that there was no coverage under the policy, refuses to give any consideration to the proposed settlement? In answering this question, it must be kept in mind that the insurer's obligation to settle, as well as the obligation to defend, arises out of the contract between the parties. The mere fact that an insurer has erroneously concluded that there is no coverage and therefore in good faith refuses to defend, cannot excuse subsequent breaches by the insurer of other provisions of the contract, including the implied obligations pertaining to settlement. To hold otherwise would result in penalizing the more prudent insurer who initially correctly recognizes the duty to defend, but subsequently wrongfully refuses a settlement offer. As stated in Comunale, supra:
"An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract. Certainly an insurer who not only rejected a reasonable offer of settlement but also wrongfully refused to defend should be in no better position than if it had assumed the defense and then declined to settle. The insurer should not be permitted to profit by its own wrong."
* * * * * *
"There is an important difference between the liability of an insurer who performs its obligations and that of an insurer who breaches its contract. The policy limits restrict only the amount the insurer may have to pay in the performance of the contract as compensation to a third person for personal injuries caused by the insured; they do not restrict the damages recoverable by the insured for a breach of contract by the insurer." 328 P.2d at 201-202.
We therefore hold that under such circumstances the insurer erroneously denying coverage and consequently refusing to give *603 consideration to a settlement offer, will be liable to its insured for any judgment subsequently entered against the insured in excess of policy limits, unless the insurer shows that an application of the equality of consideration test would not have required acceptance of the settlement offer. We recognize that this places a heavy burden on the insurer. However, when the insurer breaches his contract and erroneously refuses to defend, he does so at his own peril. Carpenter v. Superior Court, 101 Ariz. 565, 422 P.2d 129 (1967); Comunale, supra. It is the insurer's initial breach which gives rise to the consequent inattention to the interests of the insured and thus the insurer should not be allowed to escape the consequences of such inattention, absent a showing by the insurer that due attention to, and consideration of, the interests of both the insurer and the insured would not have required acceptance of the settlement offer. Therefore we reject State Farm's contention that its initial good faith denial of coverage has any direct bearing on the question of its liability for the alleged breach of its settlement obligations.
The main thrust of State Farm's argument on the question of its liability over and beyond policy limits for the alleged breach of its obligations to settle is that the misleading conduct of its insureds gave rise to an estoppel. We have previously held that the facts would not support the application of estoppel so as to preclude the insureds from changing their position and asserting facts supporting coverage within policy limits, because within such policy limitations, State Farm could show no detriment from the subsequent change of position. A substantially different question is presented, however, when our attention is directed to the claimed liability in excess of policy limits for the alleged breach of the settlement obligation. If we assume that in reliance upon their insured's assertions concerning the Rambler automobile, State Farm failed to consider the settlement offer and thereby breached its contract, thus exposing itself to consequential damages over and beyond policy limits, this constitutes a very definite additional detriment to State Farm  one which flows directly from allowing the insureds to change their position and repudiate their prior assertions.
Reviewing the evidence on this issue, it is uncontradicted that the theory of coverage advanced by the Allmons throughout the entire initial litigation, extending beyond the time of the making of the settlement offer, was that Robert Allmon became an insured under State Farm's policy by reason of the provisions of Insuring Agreement II  that he was insured as the spouse of "the first person named in the declarations". The trial court correctly rejected this theory of coverage. Further, in a very early interview, Jeanette Allmon, the owner of the Pontiac, had told a State Farm investigator that the Rambler had been purchased to replace the Pontiac, a statement directly inconsistent with any finding of State Farm liability. Also, as we have previously noted, the Allmon's counsel in the motion for summary judgment against State Farm in the initial litigation took the same factual position, stating not once, but twice, that the Rambler had been purchased to replace the Pontiac. The prime significance of these factual representations is that if in fact the Pontiac had been replaced by the Rambler, the Mustang could not thereafter have been a "temporary substitute automobile" for the Pontiac so as to impose liability, since the Pontiac would no longer have been an insured vehicle. Therefore there would have been no coverage under State Farm's policy. From the foregoing, State Farm contends that it was justified, from both the legal position taken by the Allmons, and from the factual position taken by them, in denying coverage and refusing to defend or participate in settlement negotiations. These facts, considered by themselves, would clearly create an equitable estoppel against the insureds: (1) the acts are inconsistent with a claim afterwards relied upon; (2) State Farm acted in reliance upon such actions; and (3) injury would result to State Farm if the insureds were allowed to repudiate their *604 prior conduct. Counsel for Collins contends that, based upon a statement made by John Allmon (the father of Robert Allmon) to the effect that he gave Robert the use of the Mustang because the Pontiac was broken down, and further based upon a statement made by Robert Allmon[4a] in the original litigation to the effect that he and Jeanette were using the Mustang because the Pontiac's transmission went out, that State Farm should have inferred that the Mustang was covered as a "temporary substitute automobile" for the Pontiac. This contention might have some validity if this legal theory of coverage had ever been advanced prior to the time of the entry of judgment in the initial action or if it were not for the direct factual statements made by Jeanette Allmon[5] and counsel for Robert Allmon that the Rambler had replaced the Pontiac  positions totally inconsistent with any theory, factual or legal, that at the time of the accident the Mustang was being used as a "temporary substitute" for the Pontiac. We therefore conclude that the trial judge erred in awarding judgment against State Farm in excess of policy limits. Under the evidence, the Allmons could not assert such liability, and Collins as their assignee has no greater rights.
In view of our conclusion that State Farm cannot be held liable in excess of policy limits, we need not consider the questions raised by State Farm concerning the failure of the trial court to find that the confessed judgment was reasonable in amount or that the Allmons did not enter into the judgment arrangement with Collins in good faith. We do note, however, that in any event the evidence would clearly justify a finding that Collins' personal injury damages were sufficient to support a judgment against State Farm to the full extent of State Farm's policy coverage. Likewise, our conclusion that State Farm is not liable for the alleged breach of its settlement obligations renders moot questions raised on appeal concerning the denial of State Farm's third party indemnity claim against Civil Service, based upon the allegedly fraudulent conduct of counsel in making the settlement arrangement.
The matter is remanded for modification of the judgment against State Farm in accordance with this opinion.
JACOBSON, C.J., Division 1, and DONOFRIO, J., concur.
NOTES
[1] Apart from a question of judicial estoppel considered in a later part of this opinion, there is no contention that the State Farm policy would not provide coverage for Jeanette Johnson Allmon's husband if in fact the Mustang was used as a temporary substitute for the disabled Pontiac.
[2] Some of the later decisions state that judicial estoppel may exist even in the absence of identity of parties. See Mecham v. City of Glendale, 15 Ariz. App. 402, 489 P.2d 65 (1971).
[3] The trial judge, in denying State Farm's claim of judicial estoppel, relied upon his finding:

"That the statement found in the Memorandum of Points and Authorities in Cause No. 200795 that `the Rambler had been purchased to replace the Pontiac' was made only by the attorney for Robert and Jeanette Allmon, was not made under oath, and there was no evidence to establish the fact that Robert and Jeanette Allmon ever knew of or ratified said statement."
We prefer to base our opinion upon the lack of what we consider to be an even more basic factual prerequisite.
[4] Of course the prior deposition testimony would be admissible for impeachment purposes or as an admission against interest. Udall, Arizona Law of Evidence, §§ 63 and 177 (1960).
[4a] While State Farm was joined as a third party defendant in the initial litigation on June 23, 1967, and this deposition of Robert Allmon was not taken until July 6, 1967, State Farm points out that it did not receive notice of, nor did it participate in, the taking of that deposition, and that there is nothing in the record to support a finding that it ever had knowledge of the contents thereof prior to the entry of judgment in that action.
[5] Since Jeanette Johnson was the contracting party with State Farm, we are of the opinion that her expression of intention would be of primary importance on the replacement question.